Our next case for argument is Hart against Menina. Mr. Ellis. May it please the court. My name is Benjamin Ellis, attorney for the plaintiff, appellant Carlton Hart. This case is about what happens when you turn a homicide division into a television studio for a reality television program. What happens is layers of constitutional violations causing an innocent man to spend two years in jail. And after scrambling for two years for any evidence to support his arrest and incarceration, even the Marion County Prosecutor's Office concluded there was an insufficient nexus between defendant and crime to even try his case. The IMPD never had probable cause to arrest or incarcerate my client. Rather, he was the victim of the IMPD's conflict of interest caused by payments of no less than $14,500 to Christine Menina, the lead detective on the case, another $8,250 to the other middle shift homicide detectives, and various contributions directly to the IMPD. As a result, even the appellees admit in their reply brief that the shift shaped the conduct of the defendant's investigation. So as the pressure intensified to wrap up the final episode of the first season of the shift, it was my client who paid the price. The court should reverse the district court's grant of summary judgment and judgment on the pleadings for two main reasons. First, no probable cause existed for my client's arrest or incarceration because of Christine Menina's material omissions and materially misleading probable cause affidavit. And second, because Carlton was denied his right to a speedy trial as a result of the destruction, concealment, and manufacture of evidence by the IMPD. At the heart of this case are the materially misleading representations and material omissions in Christine Menina's probable cause affidavit. Although she represented in her affidavit that Blewett identified Hart from photo array lineup 86814, the truth is that he told her at the time he was initially interviewed that he was only pretty sure and not completely sure about his identification of Carlton. More troubling, Menina misleadingly submitted the rehearsed photo array presentations of the four eyewitnesses as though they were the witnesses' first time viewing the photo arrays. And these rehearsed presentations were submitted in lieu of the two recordings of Menina's initial presentation. What she submitted in the probable cause affidavit was just the conclusion, right, that these witnesses identified this man from this photo array. That was correct. That's the text of the probable cause affidavit, Your Honor. Right. Okay. In addition to that, the supporting materials that she provided... Everything in this case boils down to a contention that Detective Menina coached the witnesses to identify them so that these were not only not independent identifications, they were known to Menina not to be independent. What evidence in the record shows that that occurred? Well, the clearest evidence that we have of what happened in the untaped initial presentations is Blewett's admission that he had told Menina that he was only pretty sure of his identification. That does not tend to show that anybody coached anybody to do anything. Well, we don't have... Witnesses are unsure of things all the time. Now, if you've got a witness who testified, here's what Menina said to me in order to get me to do this identification, that would be real evidence. We do not have that, Your Honor. What we have are missing copies, missing recordings of that initial photo array presentation. Well, no evidence is no evidence. But that no evidence, there's only no evidence because IMPD violated its policy to tape record the entirety of all witness interviews and, second, violated its constitutional duty to preserve the independent recording that was created by Lucky Shift as part of its corrections. What constitutional duty to preserve recordings? This court held in McCarthy v. Pollard that the destruction of potentially exculpatory evidence violates the defendant's right to due process if the state acted in bad faith. Of exculpatory evidence, right? Yes. But you don't have any reason to believe that this evidence was exculpatory. That's the problem. The Supreme Court of the United States has held that there's no general federal evidence preservation right. The Constitution kicks in if it is exculpatory and known to be exculpatory to the police department when they destroy the records. And that's what's missing here is that there is any reason to think that it's exculpatory. That's why I asked you the question I did. We know that there was exculpatory information contained in those initial arrays because Mr. Blewett stated that he was only pretty sure about his identification, and that's a material fact that was not included in his subsequent identification or in the probable cause affidavit. That's from the TV production notes? That's according to his statements to Detective Breedlove on the eve of a December 2009 trial. So this court should not permit the IMPD to benefit from its failure to abide by its own policies or its failure to preserve evidence. Does the Constitution require the police to record all witness interviews? The Constitution does not require the police to record all interviews, but in this case the recordings that were created by Lucky Shift show that there was exculpatory information, and that exculpatory information was not captured by Defendant Menina either in her second interview or in her probable cause affidavit. As I understand it, you're trying to hold the governmental defendants responsible for the TV production company's destruction of their raw footage. We're trying to hold the government responsible for its failure to take steps to preserve that footage. The IMPD had the right to access that information, and they, in fact, viewed it on at least one or two occasions, and it took no steps to preserve it or even to disclose it to the defendants in the underlying criminal case. Okay. How does that violate the Constitution? They had a right to control that footage. They knew that it existed and took no steps to preserve it, even though it had, to their knowledge, exculpatory information. They had a right to control it. But how did they know it had exculpatory information? Well, Detective Menina personally knew, because she conducted the interviews, that Ricky Blewett was unsure of his identification. Everything comes back to the contention that if a witness says, I'm unsure about my identification, therefore, there must have been coaching. That strikes me as total non sequitur. In addition to Blewett's statement, a second witness, Courtney Glasscock, was later deposed in the case, and she was unable to identify my client in the same photo array. She instead selected, I believe it was, she said, number three looks kind of familiar, but the only thing I really remember from that night are his teeth and his glasses. That doesn't demonstrate that Detective Menina knew that her ID was false. But it's reasonable to infer from that statement, and her inability to identify him subsequently, and from Blewett's own lack of surety, and from Menina's conduct in attempting to pressure Blewett to maintain his identification, that those witnesses were not able to independently identify my client in that unrecorded photo array. Why is that reasonable? Because if she was unable- I thought Blewett's testimony was that he was pretty sure, not that he was unsure. In another case in the Southern District recently- One witness who says he's pretty sure, and three witnesses who make a positive ID equals probable cause. We don't know what happened with those other three witnesses. We know that one of those other witnesses could not identify my client at all in a subsequent presentation. Later, but I'm talking about at the time. At the time, we had three positive IDs and one pretty sure, right? That's what formed the basis for the probable cause. We don't have any positive IDs at the time. We don't know what we have because the recordings were destroyed. In the subsequent IDs- Well, no, she recorded the IDs. She just didn't start the tape soon enough, I think is the complaint, right? She didn't record it from start to finish. What occurred is that Detective Menina did a photo-array presentation to the witnesses. After she completed the photo-array presentation, then she turned on the tape recorder and went through a very abbreviated photo-array presentation. Was this actually a tape recorder? Yes, it was a tape recorder. My God, I thought they had been abolished long ago. Detective Menina had the tape recorder when she was doing the initial presentation. She simply elected not to turn on the tape recorder because she didn't want to create any recording except for an inculpatory one. In fact, she testified that she didn't necessarily want to record a photo-array presentation that didn't have an identification because she didn't consider it to be useful. As a result, she would only then turn on the tape recorder if there was any form of identification. By doing it in that fashion, you lose the opportunity to see whether the detective used any improper techniques. You lose any expressions of doubt on the part of the witness. You only have what we have, which is an incredibly stripped-down identification. What's unconstitutional about that, if there's no constitutional duty to record a witness interview? What's unconstitutional is that if the witness expressed doubt or if the police detective used coercive leading techniques, there's not going to be any evidence of that. But there is no evidence that improper techniques were used. That's the sticking point in this case. You could get a witness, one of these four, to testify, but I gather none of them has testified to any such problem. None of the four witnesses would cooperate with us. It's not a problem of would cooperate. You can get compulsory process. And they did submit affidavits that were drafted by the INPD, but the affidavit, for instance, that was submitted by Ricky Blewett is inconsistent with his prior statements. In his affidavit, he says that he was positive about his identification. In his earlier statements, he said he was only pretty sure. So these affidavits are simply not reliable. Witnesses can wobble a good deal. But let me just, before you sit down, Mr. Ellis, I wanted to ask you about your reply brief at page five. You assert that a jury could reasonably conclude that INPD played an active role in the TV company's destruction of the raw footage. How could it reasonably conclude that without speculation? Because the footage was destroyed three days after there was a motion put forth to the court relating to the relationship between the INPD and Lucky Shift, specifically referencing the preservation of any potential recordings. And is there any indication as to communications between the people who got that motion and a chain of communications that got to the TV company, which presumably did not? No, Your Honor, we believe it can be inferred from the timing alone. Timing alone? Timing alone. Thank you. Thank you. Thank you, Mr. Ellis. Ms. Garrison. May it please the Court, My name is Beth Garrison, and I am the attorney on behalf of all of the appellees. Dismissal of this lawsuit was proper on all counts. The record overwhelmingly proves that probable cause existed for Hart's arrest. Four individuals were present at the scene the night of the shootings, and on November 22, 2008, each looked at a photo array presentation and identified Hart as one of the shooters. Officer Menina did not pressure, force, or coerce any of the witness identifications and their uncontroverted affidavits signed in June of 2013 prove just that. The officers did not destroy or hide any exculpatory or material evidence in an attempt to frame Hart. The probable cause affidavit did not include false or misleading information. The officers did not delay Hart's criminal prosecution, and Officer Menina's supervisors did not turn a blind eye to any unconstitutional conduct. And finally, the City's decision to allow a film crew to follow the homicide investigation was not the driving force behind any constitutional violation in this case because there were no constitutional violations in this case. Dismissal was proper, and this Court should affirm the District Court's entry on all accounts. First, Hart is not entitled to seek relief pursuant to Section 1983 for malicious prosecution or abusive process. Appellees concede that this Court's opinion in Julian v. Hanna opened the doors for federal malicious prosecution claims, but only if the plaintiff proves that claim under state law. What was the public interest in allowing the reality TV show to film the stationhouse activity? I'm not entirely sure what the public interest was in it. As this Court probably knows, there's cops, there's multiple different productions. This is a recipe for disaster. Right. I would agree with you. You're familiar with the Supreme Court's decision in Wilson v. Lane where the police brought reporters in in the execution of a search warrant? Yes. And the Supreme Court unanimously found that violated the Fourth Amendment. I think the two cases can be distinguished. Factually, they can be distinguished, but it's a pretty clear signal that the police are playing with fire when they bring the news media with them. And here, tell me how the timing worked on the arrest of Mr. Hart and the conclusion of filming for that episode of the show. The murders occurred on November 3, 2008. Mr. Hart was arrested on December 3, 2008. The filming was done for that particular episode, I believe, within a matter of a week or two after that. The show, Brother's Keeper, aired on January 25, 2009. I thought they were filming the investigation as it was happening. Correct. They were. So the filming began. This was the sixth episode that occurred that season, so filming had started on other homicide investigation months before that. Obviously, this particular production company was at the discretion of the police department because they can't film a homicide investigation until there's a homicide. So when the Miller homicide occurred on November 3, 2008, by random draw is how the police department does it for the particular shift that gets the investigation. Didn't Menina ask specially, though, to get in on as many as she could so that she could film what needed to be done for the show? No, that's not accurate. Menina sent an email back in August of 2008 to her direct supervisor that said, can she please be assigned the next homicide that comes out? Because there had been no homicides, and Lucky Shift was... God forbid. Thankfully, Lucky Shift hadn't been able to capture any investigation, and so she just merely requested to have the first one. There's no claim that Lucky Shift hired mob enforcers to produce a homicide? No, there's no allegations of that. And also, very importantly in this case, there's no evidence in the record whatsoever that Lucky Shift ever had any contact with the four witnesses who identified Hart on November 22, 2008. Well, they're in the room videotaping, right? They're outside the room videotaping. Outside the room, okay. Explain to me the basis for not recording the entire interviews with the photo arrays. Officer Menina had a particular practice that she believed she would put the... I know the practice. What's the justification for it? Because what she's doing, every time a witness looks at a photo of anybody and doesn't identify them, that's potential Brady material, right? Okay. Yes. For everybody whose photo is in the array, right? Yes. Okay. So why would a police officer have a legitimate basis for not recording the entire interview? Other than to articulate to you that, as this Court stated to opposing counsel, there's no constitutional right to have the entire interview. I'm not asking... There's no constitutional right on a lot of issues. I mean, I have the same concern as Judge Hamilton to say the Constitution doesn't require X doesn't mean that it's a good practice, and indeed it does suggest to those with a suspicious cast of mind, which includes judges, that the detective was trying to hide something. There would need to be more... The direct evidence in the record doesn't support even an attempted inference at that. I just don't want to get away, I don't want to take you away from Judge Hamilton's question, which is why would a police department, and I assume this is not just Detective Menina's personal practice, why would a police department think it a good idea to video only the end of a procedure? It's like holding an interrogation for two hours and then making a video of the confession, but not making a video of the procedures that produce the confession. Well, if I may answer that in two parts. One, based on the evidence that is in the record, in fact, you do have to find that it is Officer Menina's practice and Officer Menina's practice alone, because as Appellant pointed out, the deputy... You're not addressing the question, which is why anybody would think this is a good idea to do it that way. She believed that it was best to lay the photo array in front of, have them simply say... She asked one preliminary question. There is a lot of argument that's been before this Court already that she basically conducted an investigation and presented the photo array and asked them all the questions and then turned on the recorder and did it again. The evidence in the record is one question was asked. The photo array was put in front of them and asked, do you recognize anyone? When they said yes, she turned on the recorder. So what you miss are the first presentations and the witness's first reaction, surely the most relevant information, right? I would argue, Your Honor, that that is complete speculation. Does Indianapolis still do it Detective Menina's way? No, Your Honor. Again, the evidence in the record is that this was Officer Menina's practice. Deputy Chief Benjamin specifically testified in his deposition that it is not his practice to conduct it the way that she did. But even if... There must be some rules or regulations or training about how interrogators or people doing photo arrays in Indianapolis are supposed to do it, right? Yes. And how are they supposed to do it now? Present day, they turn on the recorder from the beginning. Back in 2008, I can't speak, unfortunately, as to what the policy was because there was no written policy at the time on how photo array identifications were supposed to be conducted with respect to turning the recorder on from the very beginning or not. Even if the court finds that it is not best practice what she did, that is not a constitutional violation, and this court has found just that in the case of Eskew. The four witness identifications and the affidavits that were signed are not only the evidence that should support probable cause in this case. You could completely throw out Ricky Blewett's identification if this court were so inclined. It doesn't need to do so. Mr. Blewett was specifically asked in December 14th of 2009 at a hearing before the criminal court judge, when the photo array was shown to you, was any suggestion made to you who you needed to pick? And he said no. So we have the identifications on November 22nd, 2008. We then have the Marion County lead screening prosecutor met personally with Duane, who is the victim of the shooting. I must say that that testimony doesn't cut much ice. One of the most effective means of coaching is you don't tell the suspect who to pick, but you indicate who the suspect is, sometimes by the placement of the photos, sometimes by gestures, sometimes by which thing is introduced first. If you look at the social science literature on eyewitness identification, they've identified lots of things that lead to incorrect answers. Well, if there were behavioral cues that occurred by Officer Menina, none of the four eyewitnesses picked up on it. In fact, all four of them said— They are subconscious behavioral cues. The people in these experiments, college students, alas, generally don't pick up on cues. And actually what the psychologists find is that often the people doing the interrogation don't understand that they're producing cues. It's not deliberate, but it's no less effective. Those cues would not have been captured on an audio recording either then, sir. Oh, yes, they would have. In addition to the identifications on November 22nd and the affidavits that they signed, all this court needs to look at— Let me just ask you another question about practice. One of the things that comes out of this psychology research is a suggestion that the conduct of lineups and the showing of photo IDs be double-blind. That is, the person conducting the investigation not conduct the photo ID. That an officer who hasn't a clue who in the photo ID the suspect might be conduct the photo show up. Is that what Indianapolis does these days? No, Indianapolis' policy is not that way. Then you've got an ongoing problem with suggestiveness. It's easy to prevent. The same way it's prevented in medical experiments. The person who administers either the drug or the placebo doesn't know which is the drug and which is the placebo. It's really important in medicine and in the field of eyewitness ID. In addition to the—well, let me omit that. As Judge Easterbrook indicated in the last oral argument, all this court needs is one witness identification to find that probable cause existed. That this court has repeatedly held that more investigation is not, in fact, necessary. To look at the shooting victim's statement alone. He identified—and counsel didn't get up here and articulate anything about his particular statement on November 22nd being suggestive. But more importantly, the day before Carlton Hart was arrested, the Marion County prosecutor met personally with him and asked him to explain the story, the process, how he identified Carlton Hart. And he again confirmed his absolute positive identification of Hart the day before he was arrested. Probable cause exists at the time arrest occurred. Anything developed after the fact is unnecessary. So if this court wants to completely omit and wipe out every other part of this investigation, it not only has the initial statement of Duane, it has the fact that he talked to the Marion County prosecutor the day before, and the fact that he signed an affidavit that says, to this day I still believe Carlton Hart is the man who shot me. That's an interesting argument. Let me just change the facts a little bit on you. Suppose you've got four witnesses with the ID. Three of them later say, you know, she really suggested to me that this was the guy I should identify. I did pick up a cue. Or when I was uncertain, she said, why don't you look at this one again, et cetera. And as to the fourth, let's say it was Duane Miller, we have silence. Could, would that still, would his ID still be sufficient under those circumstances? Or you've got direct evidence of coaching of the other witnesses? I would say based on the Fourth Amendment precedent that it's on the totality of the circumstances that your hypothetical presents a very different fact pattern as to the. It does, but it leaves you with one witness. It does leave with one witness. I guess to fill in some questions with your hypothetical, was this something that was known prior to the arrest because probable cause is at the time of the arrest? Or is it, for example, like here in the. Known to the detective. It's known to the detective that she suggested? Yeah. Then that would be a Fourth Amendment violation if she knew. Even if she's got one. I would say it would be a much harder case for this court than this present case is to decide. The indication that Ricky Blewett made any kind of a, I'm pretty sure, I don't know, happened well over a year after. And it's the Appellee's contention that that was with respect simply to the co-defendant and not with Carlton Hart. Again, when he was asked direct on the stand, did anyone make any suggestions for you who to pick? And he said no. The fact that this witness was willing to get up in a criminal court and say that he was unsure about one witness's identification, it's unsure why he would not get up and say it about both.  Anything further, Mr. Ellis? Thank you, Your Honor. There's a couple of issues I'd like to address based on the arguments raised by my co-counsel. The bottom line here is that regardless of what happened in the initial photo-array presentation, we know that Menina submitted a materially misleading probable cause affidavit because she still failed to disclose in her probable cause affidavit that Blewett was only pretty sure, not completely sure of his identification. She failed to disclose that she... The affidavit was submitted, it looks like, to Judge Altheis. Am I reading that signature correctly? That's my understanding, Your Honor. This is going to be true in many cases, but it's also true here. That's a judge who's seen other criminal cases a whole career and surely knows that the bottom line, the witness identified so-and-so, is a summary for the end of a process that could be much more complex and could have asked if he wanted to, right? He could have asked, Your Honor, but the onus is on Detective Menina to provide the exculpatory information in her probable cause affidavit. In addition, she failed to disclose in any fashion that there were any prior interviews and that the interviews that she submitted were not, in fact, the initial presentations to the witnesses. Opposing counsel asked that this court not reverse the trial court's judgment on the pleadings with regards to Mr. Hart's Section 1983 Malicious Prosecution and Abusive Process theories. It's our contention that the decision by this court in Julian B. Hanna controls the outcome. May I finish, Your Honor? Julian B. Hanna controls the outcome of that determination. The judge was in error in determining that Indiana plaintiffs could not bring such theories under Section 1983. Thank you, Your Honor. Thank you very much. The case is taken under advisement.